# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

PARISS K. LONDON,                                    Civ. No. 09-1310 (JMR/AJB)

       Plaintiff,

v.                                              **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.
_____

## INTRODUCTION

Plaintiff Pariss London disputes the unfavorable decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). The matter is before this Court, United States Magistrate Judge Arthur J. Boylan, for a report and recommendation to the District Court on the parties' cross-motions for summary judgment. See 28 U.S.C. § 636(b)(1) and Local Rule 72.1. Plaintiff is represented by Annie Huang, Esq. Defendant is represented by Lonnie F. Bryan, Assistant United States Attorney. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). Based on the reasoning set forth below, this Court recommends that Plaintiff's motion for summary judgment [Docket No. 11] be denied, and Defendant's motion for summary judgment [Docket No. 13] be granted.

## PROCEDURAL HISTORY

Plaintiff filed applications for disability insurance benefits and supplemental security

income on January 17, 2007 and on August 17, 2007, alleging disability beginning August 1, 2006. (Tr. 146-57, 159-65).[1] Plaintiff alleges disability from injuries of his wrist, back, left shoulder, and congestive heart failure. (Tr. 198). His applications for benefits were denied initially and upon reconsideration. (Tr. 60-70). Plaintiff timely requested a hearing before an administrative law judge, and the hearing was held on December 23, 2008, before Administrative Law Judge ("ALJ") Mary M. Kunz. (Tr. 88-89, 21-55). The ALJ issued an unfavorable decision on January 29, 2009. (Tr. 4-16). On April 10, 2009, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). See 20 C.F.R. §§ 404.981, 416.1481. On June 3, 2009, Plaintiff sought review from this Court. The parties thereafter filed cross-motions for summary judgment.

**PLAINTIFF'S BACKGROUND AND MEDICAL HISTORY**

Plaintiff was born on December 19, 1960, and was 45-years-old on the alleged disability onset date. (Tr. 159, 15). Plaintiff obtained his high school equivalency diploma, served in the Marine Corps. from 1979 until 1983, and has a work history of construction, truck driving, and as a laborer. (Tr. 147, 304-17).

The earliest medical record in the administrative file, before Plaintiff's alleged disability date, is from January 22, 2001. (Tr. 341-42.) Plaintiff had an MRI of his right shoulder that indicated mild to moderate osteoarthritis, Grade II-III chondromalacia, moderate tendinopathy, and moderate acromioclavicular joint arthropathy. (Tr. 342.)

---

[1]    The Court will cite the Administrative Record in this matter, Docket No. 10, as "Tr."

The next record, about five months later, indicates Plaintiff was examined by Dr. Paul Cederberg, an orthopedic surgeon, in relation to a Worker's Compensation Claim. (Tr. 328-33). Dr. Cedarburg reviewed Plaintiff's medical records before coming to the conclusion that Plaintiff required no additional medical treatment for his conditions of resolved contusion of the neck and right shoulder, pre-existing arthropathy of the right acromioclavicular joint, tendinopathy of the right shoulder, and pre-existing multi-level degenerative disc disease of the cervical spine. (Tr. 328-33). Dr. Cedarburg stated, "his examination is normal for someone with degenerative changes in his neck and right shoulder. The mechanism of injury is not plausible for a permanent or severe injury." (Tr. 332).

The next medical record is from 2004. Plaintiff saw Dr. Daniel D. Buss at Sports and Orthopaedic Specialists-Southwest on February 13, 2004. (Tr. 343). Plaintiff had left shoulder surgery five months earlier, but he reported right shoulder pain, with numbing and tingling into his fingers. (Tr. 343). Dr. Buss diagnosed right shoulder impingement syndrome. (Tr. 343).

Ten days later, Plaintiff saw Dr. Wanda Blaylark at Allina Medical Clinic Buffalo for bilateral shoulder pain from a work-related injury on May 23, 2003. (Tr. 334-36). Dr. Blaylark diagnosed right shoulder impingement from over compensation after surgery for a left shoulder rotator cuff tear. (Tr. 336). Dr. Blaylark opined that Plaintiff could return to work as a laborer with restrictions of no overhead reaching and no lifting more the 30 pounds with the left arm and 15 pounds with the right arm. (Tr. 334).

Plaintiff then had an MRI of his right shoulder on April 21, 2004. (Tr. 344-45). The MRI was negative for a rotator cuff tear, but indicated anatomic changes associated with impingement, glenohumeral joint effusion, and degenerative arthritis in the glenohumeral joint.

(Tr. 344).

Dr. Buss saw Plaintiff again on July 1, 2004, for a recheck of his shoulders. (Tr. 337-38). Plaintiff reported that his left shoulder was easy to tweak after surgery, and said he did not think it would get any better. (Tr. 337). Plaintiff also reported that his right shoulder pain was getting worse, and his home exercise program increased his pain. (Tr. 337). Dr. Buss recommended permanent work restrictions of no repetitive overhead use of the left shoulder and no repetitive outstretch reaching with the elbow greater than 6" from the body. (Tr. 337). Dr. Buss advised Plaintiff that he could work-out for general body conditioning. (Tr. 338).

Several weeks later, Plaintiff underwent an independent medical exam in relation to his Worker's Compensation claim. (Tr. 346-50). The examination was performed by Dr. Larry Stern, an orthopedic surgeon. (Tr. 346). Dr. Stern opined that Plaintiff suffered a rotator cuff tear on May 29, 2003, and he suffered a 6% disability. (Tr. 349). He further opined that Plaintiff could return to work with a permanent restriction against repetitive use of his left arm above shoulder level, and no weight lifting restrictions. (Tr. 349).

Plaintiff also received periodic chiropractic treatment for his injuries from Dr. Stussy at Kenwood Chiropractic Arts, beginning at least in October 2000. (Tr. 448-55). In December 2005, Dr. Stussy noted he was treating Plaintiff for "neuro-spinal stress symptoms from adapting to the stress of life." (Tr. 448).

Plaintiff's alleged onset of disability date is August 1, 2006. On August 3, 2006, Plaintiff saw Chiropractor Natalie Dousette at Kenwood Chiropractic Arts, and she completed an Employee Work Status form on Plaintiff's behalf. (Tr. 397, 447). She opined that Plaintiff was restricted to lifting 10 pounds occasionally, and sitting, standing or walking only 15 minutes

each. (Tr. 397). On August 7, an entry was made in Plaintiff's chart at Kenwood Chiropractic

Arts, indicating he was to be off work from August 3 through August 16. (Tr. 446). The record

indicates "subjective findings consistent with post traumatic subjective history" and "objective

findings consistent with post traumatic clinical condition." (Tr. 446). The following entry was

made under the heading "Assessment":

> LEFT FUNCTIONAL SHORT LEG, Pelvic blocks and/or
> activator. PATIENT HAD A 3 LEVEL ADJUSTMENT IN THE
> AREA OF C1 C5 C6 T8 T9 T10 T11 L5 sacrum left ilium (NMR)
> The patient did neuromuscular reeducation training for the
> kinesiopathological subluxation and concomitant neurological
> complications. Patient will continue on the same treatment
> schedule until next reexamination. ND[2]

(Tr. 446).

Two days later, the record indicates Plaintiff's pain continued to increase and shifted

from mid-back to low-back. (Tr. 446). Plaintiff continued chiropractic care twice a week

through February 2007. (Tr. 432-46). From September 2006 through January 2007, Dr.

Dousette opined that Plaintiff was unable to return to work, and his restrictions included

frequently lifting up to 25 pounds, and sitting, standing or walking for 30 minutes each. (Tr.

388-92).

In September 2006, Dr. Stussy referred Plaintiff to Dr. Ronald Tarrel at Noran

Neurological Clinic for consultation. (Tr. 359). Dr. Tarrel saw Plaintiff on September 12, 2006,

and Plaintiff reported his history of injuries. (Tr. 359). Plaintiff injured his back and neck in the

mid 1990s, and his symptoms cleared, but he was injured again in 2000 and received extended

---

[2]       Subsequent records suggest the initials ND stand for Nancy Dousette, who
became one of Plaintiff's treating chiropractors.

5

treatment before returning to work without restrictions. (Tr. 359). Then, on August 1, 2006, Plaintiff was working for UPS and was driving a semi-tractor. (Tr. 359). The semi-tractor was hit by a flatbed rail car, which pushed the semi-tractor about twelve feet. (Tr. 359). Several days after the accident, Plaintiff suffered significant neck and back pain, and was treated by Dr. Stussy. (Tr. 359). Plaintiff reported headache radiating up from his neck, and upper and lower-back pain. (Tr. 359). Plaintiff also reported dizziness, blurred vision associated with headache, difficulty concentrating, weakness, numbness and shaking. (Tr. 359).

Plaintiff's physical and mental status examinations were normal with the exception of left greater than right tissue texture changes in the cervical and upper back regions, and bilateral changes to a lesser degree in the lumbar spine. (Tr. 359). Dr. Tarrel diagnosed cervical and lumbar strain, aggravation of degenerative changes, and associated headache. (Tr. 360). Dr. Tarrel opined it was safe for Plaintiff to work-out at the gym and that lower weight, slow steady repetitions may be helpful to him. (Tr. 360). He also opined Plaintiff would continue to improve with therapy and treatments. (Tr. 360).

On October 12, 2006, Plaintiff had an MRI of his lumbar spine, which showed no evidence of disc herniation or stenosis. (Tr. 357). Plaintiff had MRIs of his cervical and thoracic spine in November 2006. (Tr. 353-56). The MRI of his thoracic spine indicated degenerative changes of the lower cervical spine, but no abnormality with the thoracic spinal cord. (Tr. 353). The cervical MRI showed worsening degenerative changes of the lower cervical spine with bridging anterior osteophyte of C6-7, milder changes at C5-6; essentially stable mild C6-7 and C7-T1 central canal narrowing; and stable moderate bilateral C6-7 foraminal narrowing with moderate right C7-T1 foraminal narrowing. (Tr. 355).

6

In October 2006, Plaintiff reported to Dr. Dousette that he continued to have difficulties with activities of daily living, and could not sleep more than four hours due to pain in the mid-back and left-low-back. (Tr. 439). In November 2006, Dr. Dousette noted that Plaintiff was unable to go to Tennessee for the holidays because his low back pain was exacerbated by driving for more than a half hour. (Tr. 437).

On February 16, 2007, Dr. Dousette completed an Employee Work Status form for Plaintiff and opined that he could return to work with restrictions of lifting 25 pounds frequently, sitting 2-3 hours, standing 2-3 hours, and walking 2-3 hours with the ability to alternate positions. (Tr. 382). Plaintiff saw Dr. Tarrel about ten days later, and reported that he was in the midst of a mid-back pain exacerbation. (Tr. 473). Plaintiff also reported he was moving to Tennessee to be closer to his family and to look for work. (Tr. 473). Plaintiff's examination was normal with the exception of known scoliosis with compensatory curve, tissue texture change throughout the back, and limited range of motion with rotation to either side. (Tr. 473).

Plaintiff saw Dr. Tarrel again on August 29, 2007. (Tr. 472). Dr. Tarrel noted Plaintiff had been moving around the country to look for work, but had returned to Minnesota and taken a job driving a truck. (Tr. 472). Plaintiff reported increased neck and back pain from working. (Tr. 472). Dr. Tarrel recommended further chiropractic treatment and conservative management. (Tr. 472).

Next, Plaintiff went to the Orthopedic Institute in Sioux Falls, South Dakota in September 2007. (Tr. 554). Plaintiff reported mid and low-back pain radiating into his hips and down his right leg to the knee, with symptoms present since the time of his accident. (Tr. 554). X-rays showed mild arthritic changes in the pelvis, consistent with age. (Tr. 554).

On November 4, 2007, Dr. Tarrel wrote a narrative report regarding his treatment of Plaintiff. (Tr. 594-95). Dr. Tarrel noted that he began treating Plaintiff upon referral from Plaintiff's chiropractor Dr. David Stussy. (Tr. 594). Dr. Tarrel indicated that Plaintiff had been in an accident on August 1, 2006, and developed significant neck and back pain. (Tr. 594). He also noted that Plaintiff had a medical history of left rotator cuff surgery and right forearm surgery. (Tr. 594). Dr. Tarrel noted, upon his initial examination of Plaintiff, that he diagnosed cervical and lumber strain with headache, and he also stated, "[h]e clearly had some underlying changes that were aggravated by this newer injury." (Tr. 594). Dr. Tarrel indicated that one month after the initial examination, Plaintiff was still in pain, and he prescribed anti-inflammatories and cervical traction. (Tr. 594).

Then, Dr. Tarrel noted that as time passed Plaintiff's cervical spine showed further degenerative changes, and mild degenerative changes of the thoracic spine, but no evidence of impingement. (Tr. 594). Dr. Tarrel indicated that when he saw Plaintiff in February 2007, Plaintiff was in the midst of an exacerbation of mid-back pain. (Tr. 595). And when Plaintiff returned to Dr. Tarrel in August 2007, Dr. Tarrel stated it was evident that Plaintiff had developed permanent cervical sprain with worsening underlying degenerative changes and permanent lumbar sprain with permanent upper and mid-back pain. (Tr. 595). Dr. Tarrel had opined that Plaintiff had to work under restriction of no lifting greater than 35 pounds, carrying no greater than 25 pounds, and to avoid prolonged positioning and frequent bending. (Tr. 595). After giving the above history, Dr. Tarrel opined that Plaintiff may be prone to exacerbation of his condition from time to time, he may be more prone to reinjury if exposed to trauma, and he should avoid activity that is overly rigorous or repetitive, in addition to the restrictions he gave

previously.  (Tr. 595).

Dr. Aaron Mark completed a Physical Residual Functional Capacity Assessment for Plaintiff at the request of the Social Security Administration on January 31, 2008.  (Tr. 563-70). After reviewing Plaintiff's medical records, Dr. Mark opined that Plaintiff would be limited to lifting 25 pounds frequently, 50 pounds occasionally, and limited to standing, walking or sitting, each for six hours a day.  (Tr. 564).  He also opined that Plaintiff would be precluded from rapid head or neck movements up and down or left and right, and climbing ladders, ropes or scaffolds. (Tr. 565).  Dr. Sandra Eames affirmed Dr. Mark's opinion on February 14, 2008.  (Tr. 575-76).

Plaintiff had an MRI of his thoracic spine on February 25, 2008.  (Tr. 579).  The MRI indicated T6-7 degenerative disc disease with thickening of the ligamentum flavum without cord contact or compression; thickening of the ligamentum flavum at T8-9 and T9-10 and mild degenerative disc space narrowing at T10-11.  (Tr. 579).  Plaintiff also had an MRI of his lumbar spine, which was unremarkable.  (Tr. 592).

Then, Plaintiff sought to establish care at the VA hospital in May 2008.  (Tr. 667).  In the Emergency Department, Plaintiff complained of low back pain, aggravated by sitting or driving. (Tr. 667).  Plaintiff's examination was unremarkable, but he was given prescriptions for Tylenol III and Ibuprofen until he could establish primary care.  (Tr. 667-68).

Plaintiff saw Dr. Tarrel on April 7, 2008, and reported significant pain in the upper and mid-back, with headaches.  (Tr. 593).  Plaintiff also reported he wanted to begin exercising again, and get back to work.  (Tr. 593).  Plaintiff's physical and mental status examinations were normal with the exception of decreased range of motion in the cervical, upper and mid-thoracic regions and into the upper lumbar regions.  (Tr. 593).  Noting that Plaintiff had been doing some

driving and was scheduled to do a longer drive, Dr. Tarrel stated, "I think he will be able to do this." (Tr. 593).

On August 14, 2008, Plaintiff was seen at the VA hospital for depression. (Tr. 653). Plaintiff reported that his depression was longstanding and he had learned to deal with it. (Tr. 653). He did not believe medication or therapy could help. (Tr. 653-54). Plaintiff admitted to homicidal and violent thoughts but said he was highly motivated not to harm others. (Tr. 654).

On October 16, 2008, Plaintiff went to the VA hospital and complained of back pain since working an eleven-hour shift on an oil rig. (Tr. 641). Plaintiff was advised that if he avoided stress, healing would take about two months. (Tr. 641). Later that month, Plaintiff was referred to the VA hospital for physical therapy. (Tr. 636). Plaintiff reported that his pain was exacerbated four weeks ago when he was thrown backwards and landed on a metal wall at work. (Tr. 636). He also said his pain was aggravated by sitting on hard surfaces and by overhead activities, and was relieved with Tylenol and heat. (Tr. 636). The physical therapist created a treatment plan based on Plaintiff's condition of "soft tissue and postural adaptations contributing to neck/upper back pain and suspected cervical C8 disc pathology." (Tr. 637).

On November 4, 2008, Plaintiff's chiropractor, Dr. David Stussy, wrote a "To Whom It May Concern" letter regarding Plaintiff's condition. (Tr. 581-84). Dr. Stussy noted that Plaintiff's symptoms, beginning in August 2006, included neck pain, mid and low-back pain, right arm numbness, right knee pain, fatigue, and difficulty sleeping. (Tr. 581). Dr. Stussy noted that a recent MRI of Plaintiff's cervical spine revealed "specific accelerated damage to the C6-T1 area," and also noted the main conclusion from the MRI was mild to advanced multi-level cervical spondylosis. (Tr. 581). Dr. Stussy stated that Plaintiff continued to show considerable

restriction of cervical, thoracic and lumbar ranges of motion, loss of strength and postural changes. (Tr. 582).

Plaintiff went to the VA emergency room on November 3, 2008, and reported neck and back pain, and that his head was spinning and eyes drooping. (Tr. 633-34). Plaintiff reported having briefly passed out at a stoplight the previous day, and he was feeling fatigued and depressed. (Tr. 634). He requested a CT scan of his neck. (Tr. 634). Plaintiff also asked for a diabetes check. (Tr. 635). Plaintiff was given information on pain management. (Tr. 635).

A week later, Plaintiff had an MRI of his cervical spine to evaluate his symptoms of arm and upper extremity pain. (Tr. 586-87). The MRI revealed mild to advanced multi-level cervical spondylosis, with foraminal stenosis severe bilaterally at C7-T1 with C-8 impingement. (Tr. 587). In comparison to an MRI of 2001, there was interval fusion at C6-7, and mild progression of disc degeneration at C4-5, C5-6, and C7-T1. (Tr. 587).

The VA Hospital produced a Health Summary Report for Plaintiff in November 2008. (Tr. 599-686). The report indicates that Plaintiff is "service-connected for bilateral chronic ankle sprains with residuals." (Tr. 606). Plaintiff's military service began in May 1979 and ended in March 1983. (Tr. 606). Plaintiff had a history of left ankle fracture in 1981. (Tr. 606). Plaintiff complained that his feet and ankles swell several times a month since his military service, and both his feet hurt on a level of four out of ten constantly, with pain going up to an eight or nine with prolonged standing or walking. (Tr. 606). Plaintiff reported that his foot pain increased when he drove a truck long distance, and when he tried to work long hours on an oil rig. (Tr. 606-07).

In Plaintiff's past medical history, it was noted that he had a chemically induced

myocardial infarction in the 1990s with no residuals. (Tr. 607). This occurred when he was given the drugs Sumatriptan and Ergotamine to treat a severe headache. (Tr. 615, 622). Plaintiff described current symptoms of reduced exercise tolerance and occasional atypical chest pain. (Tr. 615). Plaintiff had a heart murmur that was noted to be probably benign. (Tr. 616).

The VA report indicated that Plaintiff was taking Tylenol III and Ibuprofen as needed for pain, and that he wore orthotic shoes. (Tr. 607-08). On examination of Plaintiff's ankles, he had abnormal movement, slight instability, and was painful with range of motion. (Tr. 608-09). Plaintiff's gait was antalgic, with more weight on the right leg. (Tr. 608). The diagnosis was chronic ankle strain with mild degenerative changes and residuals. (Tr. 609-10). Plaintiff was also diagnosed with pes planus with hallux valgus.[3] (Tr. 612-13).

On November 25, 2008, Dr. Laine Ericson at the VA hospital reviewed a recent CT scan of Plaintiff's neck and noted that an abnormality at C6 appeared to be a degenerative cyst. (Tr. 628). He further noted that Plaintiff had severe arthritis at C6-7 and C7-T1, such that the nerve root outlets were severely narrowed. (Tr. 628, 680-81). Dr. Ericson set up a consultation with a neurosurgeon, and also recommended that Plaintiff be seen in physical therapy for consideration of home traction. (Tr. 628).

On January 7, 2009, Plaintiff had a right parapharyngeal deep lobe parotid tumor[4]

---

[3]     Pes planus means the arch of the foot is broken down. STEDMAN'S MEDICAL DICTIONARY ("STEDMAN'S") 1356 (27th ed. 2000) Hallux valgus is a deviation of the tip of the great toe toward the lateral side of the foot. Id. at 784.

[4]     Ten percent of parotid (salivary gland) tumors originate from the deep lobe, and 80-90% are benign.
http://www.sciencedirect.com/science?_ob=ArticleURL&_udi=B7CPN-4JCBM05-1&_user=10
&_coverDate=07%2F31%2F2006&_rdoc=1&_fmt=high&_orig=search&_sort=d&_docanchor=
&view=c&_searchStrId=1244632692&_rerunOrigin=google&_acct=C000050221&_version=1

removed at Mayo Clinic. (Tr. 688-90). Plaintiff was discharged on January 9, with instructions to follow-up in six months. (Tr. 688-89).

## TESTIMONY AT THE ADMINISTRATIVE HEARING

Plaintiff testified at the hearing before the Administrative Law Judge. (Tr. 21-45). When questioned about his education, Plaintiff testified that he had received his GED. (Tr. 28.) As to his recent work history, Plaintiff indicated that he had driven through several states looking for work after his train accident, but could not find work. (Tr. 34-35). Plaintiff testified he had done some truck driving work in Minnesota and also received unemployment in 2007. (Tr. 34). Plaintiff stated that he had not worked since October 1, 2008, when he had worked on an oil rig for two weeks. (Tr. 29-30). In November 2008, Plaintiff took a several week course for the job boiler operator. (Tr. 28-29).

Then, Plaintiff explained that he could no longer work because he is in pain and has a cyst in his spine, and a tumor in his saliva gland. (Tr. 35). He testified that he has constant pain in his mid-back. (Tr. 35-36). Plaintiff also testified that he had pain with sitting, standing and walking. (Tr. 38). Plaintiff gave an example that he had to rest after standing for five or six minutes while shaving. (Tr. 36). Plaintiff said he could sit as long as he needed, but he was in pain. (Tr. 37). He testified that when he drove a truck over the summer, he would have to pull over and stretch his legs because of his pain. (Tr. 38). He also testified that when he drove from Memphis to Toronto, he drove a couple of hours at a time. (Tr. 39). When questioned about his medications, Plaintiff indicated that he takes Tylenol III (with codeine) and Ibuprofen. (Tr. 20.)

---

&_urlVersion=0&_userid=10&md5=2084e37d33f0c35431a3746583f97ff5 (last visited March 11, 2010).

Plaintiff did not report any side effects from the medication. (Tr. 40-41).

Plaintiff testified that he lived in a room in a homeless shelter, and his only income was $230.00 monthly from the VA for disability regarding his ankles. (Tr. 42). He testified that he spent his time at medical appointments, and during the day, he would drive himself to the VA or the library. (Tr. 44-45). He also said he had a microwave in his room that he could use to cook. (Tr. 44).

A vocational expert ("VE"), Robert Brezinsky, testified at the hearing. (Tr. 47). The ALJ asked the VE to assume a 48-year-old man with a GED, Plaintiff's work experience, impairments of degenerative changes primarily of the cervical spine, history of left rotator cuff repair and right wrist surgery, treatment for chronic bilateral ankle strain with mild degenerative changes, remote history of cardiomyopathy with no residuals, and allegations of pain; who was capable of lifting up to 35 pounds, carrying 25 pounds, with no frequent bending, who needs to change position after an hour. (Tr. 49). The ALJ asked whether such a person could perform Plaintiff's past relevant work. (Tr. 49). The VE responded that he could not. (Tr. 50). The ALJ then questioned whether there were any other jobs in the national economy such a person could perform. (Tr. 50). The VE responded such a person could perform the jobs of light, unskilled machine operator such as buffing machine tender (2,000 such jobs in Minnesota), and production assembler (9,000 to 10,000 such jobs in Minnesota that would fit the restrictions). (Tr. 50).

For a second hypothetical question, the ALJ asked the VE to assume the same individual who would be limited to sedentary work, with no more than occasional overhead work, and a change of position after sitting for an hour. (Tr. 51). The VE testified that such a person could perform assembly positions (10,000 positions in Minnesota in the sedentary category), and

cashier positions (total number of positions in Minnesota reduced to 3,000 or 4,000 positions in the sedentary category). (Tr. 51).

The ALJ posed a third hypothetical question, asking the VE to assume that the individual, because of severe pain, could not focus on work tasks and could not maintain attention on a regular basis. (Tr. 52). The VE testified this would not be acceptable in competitive employment. (Tr. 52).

**THE ALJ'S DECISION**

On January 29, 2009, the ALJ issued her decision denying Plaintiff's applications for disability insurance benefits and supplemental security income. (Tr. 4). The ALJ followed the five-step sequential evaluation set forth in the agency's regulations. See 20 C.F.R. §§ 404.1520(a), 416.920(a). The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or medically equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) whether the claimant has the residual functional capacity ("RFC") to perform his or her relevant past work; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work, then the burden is on the ALJ "to prove that there are other jobs in the national economy that the claimant can perform." Fines v. Apfel, 149 F.3d 893, 894-95 (8th Cir. 1998).

At the first step of the evaluation process, in determining that Plaintiff's seasonal truck

driving work and his work on an oil rig were unsuccessful work attempts, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 1, 2006, his alleged onset date. (Tr. 9). At the second step of the process, the ALJ found that Plaintiff had severe impairments of degenerative disc disease of the cervical spine with spondylosis, history of left rotator cuff repair, history of right wrist surgery, and bilateral chronic ankle strain with mild degenerative changes. (Tr. 10).

At the third step of the evaluation, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix One. (Tr. 11). At the fourth step of the evaluation process, the ALJ determined that Plaintiff had the residual functional capacity to "lift up to 35 pounds and carry up to 25 pounds and can stand and/or walk up to 6 hours and sit up to 6 hours in an 8-hour workday with the opportunity to change positions after one hour. The claimant is precluded from frequent bending and can only occasionally perform overhead work." (Tr. 11). In making this finding, the ALJ found Plaintiff's assertions of disability were inconsistent with the objective evidence, course of treatment, daily activities, and Plaintiff's work history. (Tr. 13-14). The ALJ placed great weight on Dr. Tarrel's opinion that Plaintiff could lift 35 pounds, carry 25 pounds, and should avoid prolonged positioning and frequent bending. (Tr. 14). Noting that Plaintiff's past relevant work was at the medium-exertional level, the ALJ found that Plaintiff could not perform his past relevant work. (Tr. 15).

At the fifth step of the evaluation process, the ALJ relied on the vocational expert's testimony that a person with the residual functional capacity the ALJ assigned to Plaintiff could perform other jobs existing in the national economy including buffing machine tender and

production assembler.  (Tr. 15-16). Thus, the ALJ determined that Plaintiff was not under a disability as defined in the Social Security Act.  (Tr. 16).

**DISCUSSION**

Standard of Review

Review by this Court is limited to a determination of whether a decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).  "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  Id.

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.)  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Gavin, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability benefits.  See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof shifts to the Commissioner to show that the claimant can engage in some other substantial gainful activity.  Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir. 1985).

The ALJ properly weighed the medical opinions

Plaintiff contends the ALJ erred in her RFC determination because she relied on unsupported opinions from non-examining physicians and failed to give proper weight to the opinions of Plaintiff's chiropractor.  Plaintiff admits the ALJ stated she did not place significant weight on the opinions of the state agency physicians, but he contends the ALJ ultimately relied on nonexamining physicians' opinions as to Plaintiff's ability to sit, stand and walk because there were no statements by any of Plaintiff's treating physicians regarding such limitations. Plaintiff also contends, citing to Dr. Stussy's letter of November 2008, that the ALJ erred by failing to give any weight to the opinion of his chiropractor.

"If a treating source's medical opinion about the nature and severity of the claimant's impairment is well-supported by medical evidence and is not inconsistent with other substantial evidence in the case, the treating source opinion is entitled to controlling weight."  Tindell v. Barnhart, 444 F.3d 1002, 1005 (8th Cir. 2006).  Under the agency regulations, chiropractors are considered "other medical sources" whose opinions are not entitled to controlling weight, but whose opinions should be considered with respect to the severity of a claimant's impairments and functional restrictions.  Farstad v. Astrue, 4:07-cv-029, 2008 WL 752601, *20-21 (D.N.D. Mar. 19, 2008).  When the ALJ does not give a treating source's opinion controlling weight, the

ALJ should weigh the opinions of various sources, considering factors such as the length of the treatment relationship with the medical source; the nature and extent of the treatment relationship; the supportability of the medical source's opinion; the consistency of the opinion with the record as a whole; and the specialization of the medical source. See 20 C.F.R. §§ 404.1527(d)(2)-(6); 416.927(d)(2)-(6).

In this case, the ALJ placed great weight, but not controlling weight on the treating physician's opinion. (Tr. 14). The ALJ adopted Dr. Tarrel's opinion on Plaintiff's lifting, carrying, and bending limitations, and his restriction on maintaining a prolonged position. Dr. Tarrel did not specifically limit the number of hours Plaintiff could sit, stand or walk. Contrary to Plaintiff's assertion that there is no evidence regarding Plaintiff's ability to sit, stand or walk, the reasonable inference from Dr. Tarrel's opinion is that the duration Plaintiff can sit, stand or walk in a day is not limited beyond the restriction against maintaining a particular position for more than one hour at a time.[5] Thus, the ALJ included greater sitting, standing and walking restrictions in Plaintiff's RFC than provided by Dr. Tarrel, which suggests the ALJ found Plaintiff's subjective complaints of pain credible to some degree.

Plaintiff contends the ALJ should have granted more weight to Dr. Stussy's opinion. However, Dr. Stussy didn't cite any specific functional restrictions in his November 2008 letter that described Plaintiff's condition. (Tr. 581-84). Dr. Stussy's letter appears to have been

---

[5]     "In some disability claims the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work . . . or the prolonged standing or walking contemplated by most light work." Social Security Ruling ("SSR") 83-12.

written for the purpose of obtaining insurance coverage to continue Plaintiff's chiropractic treatment, noting Plaintiff had "the best recuperative results from chiropractic care" since his August 1, 2006 injury. (Tr. 584). Applying the factors used to weigh medical opinions, as described above, Dr. Stussy had a longer treating relationship with Plaintiff than Dr. Tarrel, but Dr. Tarrel's opinion of Plaintiff's functional restrictions is more consistent with the record as a whole. This is evidenced by Plaintiff's own testimony at the hearing that he can sit for as long as he needs, and by the fact that he engaged in seasonal employment as a truck driver after his alleged onset date. (Tr. 34, 37). And, in April 2008, Dr. Tarrel opined that Plaintiff should be able to handle a longer drive in his employment as a truck driver. (Tr. 593).

Furthermore, MRIs of Plaintiff's lumbar spine were unremarkable, and the only diagnosis regarding Plaintiff's low back pain was lumbar strain. (Tr. 357, 360, 592). Although this could be expected to cause some pain, the record does not support a finding of disabling low back pain. See Baker v. Apfel, 159 F.3d 1140, 1145 (8th Cir. 1998) (the question isn't whether the claimant experiences some pain, but whether the pain is of a disabling nature); Walker v. Astrue, 08-5234, 2010 WL 55869, *8 (W.D. Ark. Jan. 4, 2010) (pain from lower back strain not disabling).

Plaintiff's testimony that he can only stand for five or six minutes is inconsistent with the eleven-hour shifts he worked on an oil rig in September 2008. (Tr. 606-07, 641). See Naber v. Shalala, 22 F.3d 186, 189 (8th Cir 1994) (ability to perform work during relevant time period supported ALJ's conclusion claimant could perform light work despite pain); Medhaug v. Astrue, 578 F.3d 805, 816 (8th Cir. 2009) (it was proper for ALJ to consider employment positions maintained after alleged onset of disability). On October 27, 2008, when Plaintiff was asked by a physical therapist what aggravated his pain, Plaintiff said sitting on hard surfaces and

overhead activities, but he did not mention standing or walking. (Tr. 636).

Dr. Stussy did not opine as to Plaintiff's functional restrictions, but on February 16, 2007, Plaintiff's other chiropractor, Natalie Dousette, restricted Plaintiff to 2-3 hours each of sitting, standing and walking in a day. (Tr. 382). Dr. Dousette described Plaintiff's condition as "kinesiopathological subluxation and concomitant neurological complications."[6] (Tr. 446.) This is not very enlightening as to Plaintiff's functional restrictions, and the only support in her treating records for these restrictions are Plaintiff's subjective complaints. (Tr. 397, 432-46). See Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (ALJ entitled to discount opinion based largely on claimant's subjective complaints, rather than objective medical evidence).

Plaintiff also suggests the record is deficient because Dr. Tarrel did not review the most recent MRI of Plaintiff's cervical spine from November 2008. The MRI of Plaintiff's cervical spine in November 2008 indicated severe foraminal narrowing at C7-T1 with C8 impingement. (Tr. 586-87). The difference between the November 2008 MRI and an MRI of Plaintiff's cervical spine in 2001, five years before his alleged disability onset date, was "interval fusion at C6-7, and mild progression of disc degeneration at C4-5, C5-6, and C7-T1." (Tr. 587).

Given the alleged onset date of August 1, 2006, Dr. Tarrel's opinion concerning Plaintiff's residual functional capacity was supported by substantial evidence of the MRIs that Dr. Tarrel reviewed of Plaintiff's lumbar, thoracic, and cervical spine from October and November 2006. Dr. Tarrel's opinion of Plaintiff's functional restrictions is further supported by his continued clinical evaluation and treatment of Plaintiff through April 2008. There is no

---

[6]        Kinesiopathological means abnormal motion. STEDMAN'S at 950. Subluxation means an incomplete dislocation. Id. at 1716.

evidence in the record that Plaintiff was given any additional restrictions as a result of his November 2008 MRI of the cervical spine, which is consistent with the fact that the changes were viewed as a "mild progression in disc degeneration" since 2001. Although Dr. Tarrel may not have reviewed Plaintiff's November 2008 MRI, his opinion was supported by other evidence in the record. See Anton v. Astrue, No. 4:08-CV-514 (CEJ), 2009 WL 2905938, *17 (E.D. Mo. Sept. 8, 2009) (ALJ need not seek clarifying statements from a physician unless a crucial issue is undeveloped). In summary, the ALJ properly weighed the medical opinions, and the record as a whole is consistent with the treating physician's opinion of Plaintiff's functional restrictions.

<u>The ALJ properly analyzed Plaintiff's credibility, and the ALJ's RFC determination is supported by substantial evidence.</u>

In determining a claimant's residual functional capacity, the regulations require the ALJ to consider how all of the claimant's impairments, including any symptoms such as pain cause physical and mental limitations that may affect the ability to work. 20 C.F.R. § 404.1545. "The ALJ must determine the claimant's RFC based on all relevant evidence, including, medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations." Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004).

The ALJ must consider a claimant's subjective complaints of pain, including: claimant's prior work record; and observations by third parties and treating and examining physicians relating to 1) the claimant's daily activities; 2) the duration, frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007) (citing Polaski v. Heckler, 729 F.2d 1320, 1322 (8th Cir. 1984). The ALJ must take into account, but does not need to discuss how each factor relates to plaintiff's credibility. Id. (citing Tucker v. Barnhart,

363 F.3d 781, 783 (8th Cir. 2004). However, the ALJ may discount subjective complaints when they are inconsistent with the evidence as a whole. Id. (citing Polaski, 739 F.2d at 1322).

Plaintiff argues the ALJ's cursory inquiry on how he performed personal and household chores, worked out in a gym under a physician's supervision, traveled out of necessity, and performed seasonal work was insufficient to support a finding that he could perform work day in and day out on a competitive basis. Defendant, on the other hand, contends the ALJ's credibility analysis is supported by substantial evidence in the record including evidence that Plaintiff looked for employment, received unemployment benefits, worked full-time on an intermittent or seasonal basis; worked out at gym, traveled extensively; drove, shop, cooked, cleaned, did laundry, and groomed himself.

The record confirms that the ALJ properly considered the medical evidence and the evidence in the record as a whole when analyzing the credibility of Plaintiff's subjective complaints of pain, and in determining Plaintiff's residual functional capacity. First, the ALJ reviewed all of the objective medical findings in the record, and, as described above, properly weighed the medical opinions. Second, the ALJ considered Plaintiff's daily activities, which after the alleged onset date included traveling across the country to look for work, working as a truck driver, and working out at a gym. (Tr. 13-14). The ALJ also noted that as late as December 2008, Plaintiff completed a course to be a boiler operator. (Tr. 14). Even if the ALJ did not inquire as to how Plaintiff performed each of these activities, the fact that Plaintiff could do all of these things after his alleged onset date is inconsistent with his testimony that he is disabled by pain. See Medhaug, 578 F.3d at 816-17 (driving school bus six hours a day and

performing household chores inconsistent with subjective complaints of disabling pain).

Third, the ALJ discredited Plaintiff's testimony because his treatment for pain was conservative, and he sought little or no treatment for his ankles, shoulder and right wrist. (Tr. 13). Plaintiff began treating with his chiropractor for back pain twice a week after his accident in August 2006. (Tr. 432-46). When Plaintiff saw Dr. Tarrel the next month, Dr. Tarrel did not prescribe any medications or other types of treatment, and he suggested working out at a gym may benefit Plaintiff. (359-60). One month later, Dr. Tarrel recommended anti-inflammatory medication. (Tr. 594). When Plaintiff reported having increased pain from working in August 2007, Dr. Tarrel recommended further chiropractic treatment and conservative management. (Tr. 472). Evidence in the record supports the ALJ's analysis of Plaintiff's conservative treatment. See Craig v. Chater, 943 F.Supp. 1184, 1189 (W.D. Mo. 1996) ("Allegations of a disabling impairment may be properly discounted because of inconsistencies such as minimal or conservative medical treatment."

Fourth, the ALJ discounted Plaintiff's credibility because he received unemployment benefits after his alleged onset date, and because Plaintiff had a sporadic work history with inconsistent wages. (Tr. 14, 34, 166-67, 215-223, 304-17). Plaintiff received unemployment benefits in 2007. By applying for unemployment compensation, an applicant must hold himself out as available, willing and able to work. Jernigan v. Sullivan, 948 F.2d 1070, 1074 (8th Cir. 1991). Low earnings also reflect little incentive to work. Clark v. Chater, 82 F.3d 202, 203 (8th Cir. 1996). Considering the objective evidence, Plaintiff's testimony, the physicians' opinions, Plaintiff's daily activities, course of treatment, and work history, the ALJ properly analyzed

Plaintiff's subjective complaints of pain under the <u>Polaski</u> factors, and determined that Plaintiff's allegation of disability from pain was not fully credible.

In conclusion, the ALJ properly weighed the medical opinions and analyzed Plaintiff's subjective complaints. The objective medical evidence, and the record as a whole, supports the ALJ's RFC determination, which formed the basis for the vocational expert's testimony that Plaintiff can perform work which exists in significant numbers in the economy. Therefore, the ALJ's decision should be affirmed.

**RECOMMENDATION**

IT IS HEREBY RECOMMENDED THAT:

1.     Plaintiff's Motion for Summary Judgment be denied [Docket No. 11];

2.     Defendant's Motion for Summary Judgment [Docket No. 13] be granted.

Dated: March 23,2010                    s/__s/ Arthur J. Boylan_____
                                         ARTHUR J. BOYLAN
                                         United States Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before April 6, 2010.